IN HALL SUPERIOR COURT, SEPTEMBER, 1830.

## The STATE *vs.* GEORGE TASSELS.

### *Indictment for Murder.*

THIS was an indictment against the prisoner, a native Cherokee Indian, for the murder of another native Cherokee Indian, within the territory in the occupancy of the Cherokee tribe of Indians. The indictment has been found under a statute of this State, passed in the year 1829, for extending the laws of this State over the Cherokee country and for the purpose of giving the Superior Courts of certain counties jurisdiction of offences committed in the said Cherokee territory, annexes the whole of said territory to certain counties of the State bordering on the same. A part of said territory was attached to the county of Hall, and it was in the part so attached, that the offence described in the indictment was charged to have been committed. To this indictment a plea to the jurisdiction of the court was filed, and the judge presiding in Hall county has reserved the question for the opinion of the judges in convention.

*Underwood*, who was counsel for defendant, contended in support of the plea, that the act of 1829, of the State of Georgia, extending the criminal jurisdiction of the State over the Cherokee country was unconstitutional, and therefore void. That by various treaties negotiated between the United States and the Cherokee Indians, beginning with the treaty of Hopewell, and ending with the year 1819, the Cherokee *nation* had been treated with, and considered an independent sovereign State, and therefore could not be subjected to the laws of a State—that in those several treaties the right of self-government had been expressly recognized and distinctly maintained by the Cherokee tribe or nation—that extending the criminal jurisdiction of the laws of Georgia over the Cherokee nation, was an infringement of the right of self-government secured to the Cherokee Indians by the treaties with the United States, which treaties were by the constitution of the United States, declared to be the supreme law of the land. The constitution declares all treaties made, or to be made, the supreme law of the land. The treaty of Hopewell is of

anterior date to the constitution, and is therefore expressly recognized by it, and consequently entitled to more weight in the decision of this question. That treaty contains an article acknowledging the right to declare war against the United States, which by counsel was relied upon as unequivocal evidence that the United States acknowledged the Cherokee Indians to be a sovereign, foreign State, possessing at least the sovereign attribute of declaring war.

Mr. *Trippe*, solicitor general of the western circuit, in reply, cited Kent's Commentaries, vol. 3. to show that Indian tribes had been considered inferior, dependent, and in a state of pupilage to the whites. He placed much stress upon that part of the articles of cession and agreement of 1802, between the State of Georgia and the United States, by which the United States relinquishes to the State of Georgia all her rights to the land lying east of the tract ceded by the State of Georgia to the United States. He denied the inference drawn by adverse counsel from the article in the treaty of Hopewell, which regulates the manner in which future wars should be commenced between the two people.—And he contended that the treaties were void, because the general government had no right to treat with Indians within the limits of the State, but upon the single subject of commerce, that being the only power granted them in the constitution.

*By the Convention of Judges.* This is a very grave and important question, which probably never would have been submitted to judicial investigation, but for the political, party and fanatical feeling excited during the last session of Congress. When the Indians attending at Washington last winter, and their advocates, discovered that the decision of the two houses would be unfavorable to them, the idea of bringing the question before the Supreme Court was suggested and eagerly seized upon by the deputation of the Cherokees.

In consequence of that determination, it is presumed that the plea now under consideration has been interposed. The manner however in which this plea has been interposed ought not, and it is presumed will have no influence upon its decision. The relations which have existed between the Indian tribes of the American continent and the different European nations who have established colonies in America, and with the colonies themselves, are to be collected from the histories and public acts of those nations, and for the space of about two hundred years. During that time, many changes of public opinion and of public conduct towards the Indian tribes have taken place; which changes are strongly marked in the records and proceedings of the different European nations who had colonial establishments in America. Those changes have, however, introduced some uncertainty as to the actual relations which ought to exist, and do actually

HALL,
September,
1830.

The STATE
*v.*
TASSELS.

exist, between the governments formed by European descendants and the aboriginal tribes. But the conduct of the crown of Great Britain to the Indian tribes has been less variant. The relation between this State and the Cherokee Indians depends upon the principles established by England towards the Indian tribes occupying that part of North America which that power colonized. Whatever right Great Britain possessed over the Indian tribes, is vested in the State of Georgia, and may be rightfully exercised. It is not the duty, nor is it the intention of this convention to enter into a vindication of the rights exercised by the British Crown over the Indian tribes ; but if the question is considered open to investigation, no doubt is entertained that the policy adopted by the British Crown towards the Indian tribes might be vindicated by reason, sound morality and religion. But this whole question is ably elucidated in the decision of the Supreme Court, in the case of Johnson *v.* McIntosh, 8 Wheat. Repts. 543. part of which, this convention will transcribe in this decision. After stating that discovery gave to the discovering nation an exclusive right to the country discovered, as between them and other European nations, the decision proceeds—" Those relations which were to exist between the discoverer and the natives were to be regulated by themselves. The rights thus acquired being exclusive, no other power could interpose between them. In the establishment of these relations, the rights of the original inhabitants were in no instance entirely disregarded, but were necessarily to a considerable extent impaired. They were admitted to be the rightful occupants of the soil, with a legal as well as just claim to retain possession of it, and to use it according to their own discretion ; but their rights to complete sovereignty as independent nations were necessarily diminished, and their power to dispose of the soil to whomsoever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it. While the different nations of Europe respected the right of the natives as occupants, they asserted and claimed the ultimate dominion in themselves, and claimed and exercised as a consequence of this ultimate dominion, a power to grant the soil, while yet in possession of the natives. These grants have been considered by all, to convey a title to the grantees, subject only to the Indian right of occupancy. The history of America from its discovery to the present day, proves, we think, the universal recognition of these principles."

After giving the history of various grants by Great Britain, France and Spain, to lands in the occupancy of Indian tribes, it adds, " Thus all the nations of Europe, who have acquired territory in America, have asserted in themselves, and have recognized in others, the exclusive right of the discoverer to appropriate the lands occupied by the Indians." Have the

HARVARD LAW SCHOOL LIBRARY.

HALL,
September,
1830.

The STATE
v.
TASSELS.

American States rejected or adopted this principle? The decision then proceeds to show that the United States have adopted the principle, and acted upon it as far as they have acted. The opinion adds "The United States then have unequivocally assented to that great and broad rule, by which its civilized inhabitants now hold this country. They hold and assert in themselves the title by which it was acquired. They maintain, as all others have maintained, that discovery gave an exclusive right to extinguish the Indian title to occupancy, either by purchase or by conquest, and gave also a right to such a degree of sovereignty as the people would allow them to exercise." Again, on page 591, the decision proceeds—"However extravagant the pretension of converting the discovery of an inhabited country into conquest may appear; if the principle has been asserted in the first instance, and afterwards sustained; if a country has been held and acquired under it; if the property of the great mass of the community originates in it, it becomes the law of the land, and cannot be questioned. The Indian inhabitants are to be considered merely as occupants, to be protected, indeed, while in peace, in the possession of their lands, but to be deemed incapable of transferring the absolute title to others. However this restriction may be opposed to natural right and to the usages of civilized nations, yet if it be indispensable to that system under which the country has been settled, and be adapted to the actual condition of the two people, it may perhaps be supported by reason, and certainly cannot be rejected by courts of justice. This question is not new to this court. The case of Fletcher v. Peck, 5 Cranch. 87, grew out of a sale made by the State of Georgia, of a large tract of country within the limits of that State, the grant of which was afterwards resumed. The action was brought by a subpurchaser on the contract of sale, and one of the covenants in the deed was, that the State of Georgia was at the time of sale, seized in fee of the premises. The real question presented by the issue was, whether the seizin in fee was in the State of Georgia or in the United States. After stating that this controversy between the several States had been compromised, the court thought it necessary to notice the Indian title, which, although entitled to the respect of all courts until it should be legitimately extinguished, was declared not to be such as to be absolutely repugnant to a seizin in fee in the State."

In addition to the preceding authorities, tending to show that the Indian tribes found in America, when it was discovered by the Europeans, were not, and could not be considered sovereign States, two other facts resulting from the legislation of the United States, will be brought into view.—1st. The Constitution of the United States gives to Congress power to regulate commerce with foreign nations, among the sev-

eral States, and with the Indian tribes. In exercising the first part of this grant, Congress has prescribed rules and regulations, with which foreigners must comply when they come to the ports and are within the jurisdiction of the United States. All sovereign States have exercised the same power in the same way. But when Congress exercises the latter power, viz., the power of regulating trade with the Indian tribes, the law directs how the citizens of the United States shall conduct towards the Indians, and how the Indians shall behave to them. Whence this difference of conduct under the same grant of power? Because the subjects of European kingdoms, who come into the American ports to trade, are component parts of sovereign and independent States, and the Indians, whose trade is so differently regulated, are members of communities that are not sovereign States.

2d. The Constitution of the United States gives to Congress the right of declaring war. Presidents Washington, Jefferson, Madison and Monroe, each waged war with Indian tribes; yet the statute book of the United States contains not a single declaration against an Indian tribe. Is it conceivable that the two houses of Congress would have silently acquiesced in the usurpation of their rights by the executive department, if the Indian tribes had been supposed to be the proper objects of a declaration of war? They must have been judged improper objects of a declaration of war, only because they were held not to be sovereign States. Indeed it is difficult to conceive how any person, who has a definite idea of what constitutes a sovereign State, can have come to the conclusion that the *Cherokee Nation* is a sovereign and independent State. By the cases of Johnson *v.* M'Intosh, and Fletcher *v.* Peck, it has been determined by the Supreme Court of the United States, that no title to land can be derived from them immediately to an individual, and that a State is seized in fee of all lands within its chartered limits, notwithstanding the land may be in the occupancy of the Indians, and that such grants are good and valid, and cannot be questioned in courts of law. Counsel in support of the plea to the jurisdiction, admitted that the Cherokee Indians could not alien or transfer their lands to any but the State of Georgia or to the United States for her use, but seemed to suppose this limitation of their sovereignty was the result of treaty stipulations. This is a mistake. No treaty can be found, in which any Indian tribe has agreed that another government should be authorized to alien and transfer its territory. The decision, that the State of Georgia was seized in fee of the Yazoo lands, was not the result of any treaty, but the legal consequence of the right acquired by the European nations, upon their first discovery of any port of the American continent. Vattel, p. 101 says, "We do not therefore deviate from the views of nature, in confining the Indians within narrower limits. However, we

30

HALL,
September,
1830.

The STATE
v.
TASSELS.

cannot help praising the moderation of the English Puritans, who first settled in New England, who, notwithstanding their being furnished by a charter from their sovereign, purchased of the Indians the land of which they intended to take possession. This laudable example was followed by William Penn and the colony of Quakers that he conducted to Pennsylvania." From this quotation, it is manifest that Vattel held that they had a legal right to the land within their charter, without any purchase from the Indians. Other passages from the same author support the same doctrine. The State of New York, as late as the year 1822, vested in their courts exclusive criminal jurisdiction of all offences committed by Indians within their reservations; other States have followed the example in a greater or less degree, and every thing has gone on quietly; but so soon as the State of Georgia pursues the same course, a hue and cry is raised against her, and a lawyer residing near 1000 miles from her borders has been employed to controvert her rights and obstruct her laws, and who has not been ashamed to say that he has been able to find no authority which justifies a denial to the *Cherokee Nation* of the right of a *sovereign, independent State*. Yet by the decision of the Supreme Court, which cannot be unknown to that gentleman, every acre of land in the occupancy of his *sovereign, independent Cherokee Nation,* is vested in fee in the State of Georgia. It is presumed to be the *first sovereign independent State* which did not hold an acre of land in fee, but which was admitted to hold every acre of land only by occupancy, while the title in fee was held by a foreign sovereign State. The Convention, from the view which the authorities previously presented furnish, can discover no legal obstacle to the extension of the laws over the territory now in the possession of the Cherokee Indians. If any obstacle to that extension exist, it must be sought for in those treaties which have been negotiated between the Cherokee Indians and the United States. But here a preliminary question is presented. Are the Indian tribes within the limits of the United States, legal objects of the treaty making power? It has been shown in the preceding part of this decision, that they have not been considered legal objects of a declaration of war. It has also been shown that by all the departments of the government, they have not been treated as a sovereign, independent State, in the regulation of its commerce. Can any farther evidence be required, that the Indian tribes are not the constitutional objects of the treaty making power? It is presumed not. It seems to be self-evident that communities which have been determined not to be objects of a declaration of war, cannot be the objects of the treaty making power. But it may be answered, that the President and Senate have determined that the Indian tribes are the proper objects of the treaty making power, and that trea-

ties have actually been made with them. This is admitted. But it may be safely contended that a construction put by the President and Senate on that part of the Constitution, which grants the treaty making power, is not entitled to as much weight as a construction placed upon other parts of the Constitution by all the departments of the government, entirely inconsistent with that placed upon the treaty making power, by only two of the departments which had concurred in that construction.

But for the purpose of investigating the subject more fully, let it be for the present taken for granted, that the Indian tribes are the proper objects of the treaty making powers. The rights and the relations of those tribes had been unalterably fixed long before the treaty making power created by the Constitution of the United States existed, and it was not competent for that power, when rightfully exerted, to alter or change those rights and relations. The rights of the Indians to the soil upon which they lived, was that of occupancy only, the fee being vested in the State of Georgia. Any attempt to change the right of occupancy into a fee, would have invaded the seizin in fee declared to be vested in Georgia by the Supreme Court of the United States, and would have been null and void. Again, the relations existing between the Cherokee Indians and the State of Georgia were those of pupilage. No treaty between the United States and the Cherokees could change that relation, could confer upon them the power of independent self-government. If there are any clauses in any of the compacts between the United States and the Cherokee Indians (miscalled treaties) which give to those Indians the right of independent self-government, they are simply void, and cannot, and ought not to be permitted to throw any obstacle in the way of the operation of the act of Georgia, extending jurisdiction over the country in the occupancy of the Cherokee Indians. But it may be urged, that the State of Georgia having neglected for about fifty years to exercise this jurisdiction over the Cherokee Indians, is barred by the lapse of time, from exercising it now. It might be deemed a sufficient reply to this objection to cite the maxim " *nullum tempus*," which has been determined by the courts of this State, and as far as is known to this Convention, by all the States to apply to the State governments, with the same force as it applied to the British King. But this Convention will not rest the reply upon this maxim, because a more intelligible and satisfactory reason can be readily given. When America was first discovered, as has been shown in the decision of Johnson *v.* M'Intosh, discovery was considered equivalent to conquest. It became therefore the duty of the discovering, or conquering nation, to make some provision for the aborigines, who were a savage race, and of imbecile intellect. In ordinary conquest, one of two modes was adopted. Either the conquer-

ed people were amalgamated with their vanquishers, and became one people; or they were governed as a separate but dependent State. The habits, manners, and imbecile intellect of the Indians, opposed impracticable barriers to either of these modes of procedure. They could neither sink into the common mass of their discoverers or conquerers, or be governed as a separate dependent people. They were judged incapable of complying with the obligations which the laws of civilized society imposed, or of being subjected to any code of laws which could be sanctioned by any christian community. Humanity therefore required that they should be permitted to live according to their customs and manners; and that they should be protected in their existence, under these customs and usages, as long as they chose to adhere to them. But the Cherokees now say, they have advanced in civilization, and have formed for themselves a regular government. Admit the fact, they are there in a situation to be brought under the influence of the laws of a civilized State—of the State of Georgia. The obstacle which induced the State of Georgia to forbear the exercise of the rights which Great Britain, as the discovering nation had authority to exercise over them, and which, vested in Georgia, no longer exists, if the Cherokees or their counsel are to be believed. The State of Georgia is imperiously called upon to exercise its legitimate powers over the Cherokee territory. Indeed, it seems strange that an objection should now be made to that jurisdiction. That a government should be seized in fee of a territory, and yet have no jurisdiction over that country, is an anomaly in the science of jurisprudence; but it may be contended that, although the state of Georgia may have the jurisdiction over the Cherokee territory, yet it has no right to exercise jurisdiction over the persons of the Cherokee Indians who reside upon the territory of which the State of Georgia is seized in fee. Such distinction would present a more strange anomaly, than that of a government having no jurisdiction over territory of which it was seized in fee. This convention holds it to be well established, that where a sovereign state is seized in fee of territory, it has exclusive jurisdiction over that territory, not only on the surface and every thing that is to be found in that surface, but as Sir William Blackstone defines, a title in fee simple to lands, that it extends not only over the surface, but "*usque ad coelum,*" &c. Now the right of the tenant in fee could not be less extensive than that of the *power* granting the fee. The seizin in fee, therefore, vests not only the surface, but the bowels of the earth, and through the air about the earth, as far as the air can be appropriated to the use of man, or even "*usque ad coelum*" as the maxim has it. If seizin in fee vests in the tenant not only the surface, but extends to the centre downwards, and to heaven upwards, what, this convention would respectfully inquire, is to limit the right of jurisdiction?

In conclusion, it may be proper to notice some of the arguments and positions assumed by counsel in support of the plea. It was contended that the article in the treaty of Hopewell which required the Indians, in case of real or supposed wrongs, to demand satisfaction for the injury, and if it was refused to give notice of intention to make war. This was considered by counsel as unequivocal evidence of the recognition by the United States of the Cherokee Indians as a sovereign State. It does not appear so to this convention. The Indian tribes in North America were as ferocious as barbarous. They had been immemorially in the habit of making secret and bloody attacks upon the white settlements. These attacks usually struck the white settlers with panic terror by the secrecy and rapidity with which they were perpetrated. To guard against a mischief so terrific and appalling, the treaty imposes upon the Cherokee Indians the obligation of giving notice of their intention to make their bloody incursions into the white settlements. It was a salutary restriction which was the origin of, at least, one approach towards the habits and usages of civilized man. To have omitted the restriction for fear of the admission which it is contended is given to the Cherokee Indians of making war upon the United States, would have been weak. For it was matter of universal notoriety, that the various Indian tribes within the United States were immemorially in the habit of making war in the manner above described, and the restriction was a salutary one, and has had the desired effect. Counsel for the Cherokee Indians contended that by the articles of treaty and cession between the State of Georgia and the United States, the former had given the latter a right to hold treaties with the Cherokee Indians, and that the State of Georgia was bound to abstain from all efforts to extinguish the Indian right to lands within her own limits. This convention conceives both positions to be erroneous.

1st. The articles of treaty and cession conferred no right upon the United States to hold treaties with the Cherokee Indians. Those articles impose upon the United States the duty of extinguishing the Indian title, but confer no political power on the federal government. If there be such a thing as a political axiom it is certainly one that the federal government can derive no political power from a compact with an individual state. That government had at the time of entering into those articles the right of holding treaties with the Indians or it had not. If it be true, as intimated by counsel, that the title to Indian lands could be extinguished only by treaty, and the federal government had no right to make such treaties, then the federal government in entering into the articles of treaty and session took upon itself an impossible condition. But it is not true that the Indian title cannot be extinguished but by treaty. That title can be extinguished by

bargain and sale or by deed as well without the form of a treaty as with it. Indian treaties for extinguishing their right to their lands are in fact, though not in form, nothing but contracts for the purchase and sale of Indian lands. But secondly, the state of Georgia in imposing the obligation upon the United States to extinguish the Indian title to lands within her limits did not relinquish any right she possessed of extinguishing that right herself. Having given a valuable consideration to another power to induce that power to assume the obligation of extinguishing the Indian title, it was natural that she should rely upon the good faith of that power in discharging its engagements, and should cease for a reasonable time any direct efforts to effect the same object. But if the contracting power should act with bad faith or should from any other cause disappoint the just expectations of the state; Georgia might rightfully resume her suspended right of extinguishing the Indian title, and demand payment from the United States of whatever sum the extinguishment cost her. It may be proper before closing this opinion to state, that the United States in their practice under the constitution, consider all Indian tribes within or without the United States improper objects of a declaration of war. The Seminole Indians were resident in Florida, then a province of Spain; yet the President prosecuted a war against them, without a declaration of war. The wants of that war produced a deep sensation in the nation, and were discussed with animation in the two houses of congress; yet during the whole of that discussion, no intimation was thrown out on any side of either house calling in question the right of the President to prosecute a war with an Indian tribe, even resident out of the limits of the United States. This convention deems it a waste of time to pursue this examination. It has satisfied itself, and it is hoped the community, that independent of the provision of the state constitution claiming jurisdiction over its chartered limits, that the State of Georgia had the right in the year 1829, to extend its laws over the territory inhabited by the Cherokee Indians, and over the Indians themselves; that said act of 1829, is neither unconstitutional, nor inconsistent with the rights of the Cherokee Indians. The plea to the jurisdiction of the court submitted to this convention is therefore overruled.